## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| TRI-STATE JOINT FUND, on Behalf of Itself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> INTEGRYS ENERGY GROUP, INC., WISCONSIN ENERGY CORPORATION, CHARLES A. SCHROCK, WILLIAM J. BRODSKY, ALBERT J. BUDNEY, JR., ELLEN CARNAHAN, MICHELLE L. COLLINS, KATHRYN M. HASSELBLAD-PASCALE, JOHN W. HIGGINS, PAUL W. JONES, HOLLY KELLER KOEPPEL, MICHAEL E. LAVIN, WILLIAM F. PROTZ, JR., and GALE E. KLAPPA, <br><br> Defendants. | Case No. _____ <br><br> Judge: <br><br> Magistrate Judge: <br><br> **<u>JURY TRIAL DEMANDED</u>** |

## CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(a) AND SECTION 20(a) OF THE SECURITIES AND EXCHANGE ACT OF 1934

1.      Plaintiff Tri-State Joint Fund ("Plaintiff" or "Tri-State") brings this shareholder class action for violation of Sections 14(a) and 20(a) of the Securities and Exchange Act ("Exchange Act"), 15 U.S.C. §§ 78n, 78t, both for itself and on behalf of all similarly situated holders of Integrys Energy Group Inc. (NYSE: TEG) ("Integrys" or the "Company") common stock against Integrys, the members of Integrys' Board of Directors (the "Board" or the "Board Member Defendants") and Wisconsin Energy Corporation (NYSE: WEC) ("Wisconsin Energy"). This action seeks to rectify existing and future irreparable harm to the Company's shareholders arising from the proposed acquisition of Integrys by Wisconsin Energy (the "Proposed Acquisition."). On behalf of itself and all holders of Integrys common stock, Plaintiff seeks equitable relief to enjoin the Proposed Acquisition before it is consummated.

## NATURE OF THE ACTION

2.      Integrys is a diversified energy holding company that manages in excess of $10 billion in assets.  The Company operates in the non-regulated energy market through a wholly owned subsidiary entitled Integrys Energy Services, and operates six regulated natural gas and electric utilities in Wisconsin, Michigan, Minnesota, and Illinois.  In addition, Integrys holds a 34% stake in American Transmission Company LLC, an electric transmission company operating in Wisconsin, Michigan, Minnesota, and Illinois.

3.      Wisconsin Energy's regulated utilities provide gas and electric services to consumers in parts of Wisconsin and Michigan's Upper Peninsula.  These regulated utilities operate under the trade name "We Energies." Wisconsin Energy further designs, builds and owns power plants through W.E. Power, LLC and develops and invests in real estate through WISPARK, LLC providing electric and natural gas services to customers in parts of Wisconsin and Michigan's Upper Peninsula.

4.      Against this backdrop, on June 23, 2014, the Company announced that it had entered into Agreement and Plan of Merger (the "Merger Agreement") pursuant to which Wisconsin Energy will purchase Integrys for 1.128 Wisconsin Energy shares and $18.58 per share in cash for each Integrys share.  Based on the closing price of Wisconsin Energy common stock on the last trading day before the announcement, the Proposed Consideration values shares of Integrys at $71.47 per share, a 17.3% premium over the closing price of Integrys common stock on the last trading day before the announcement, and places the total transaction consideration at approximately $9.1 billion (including $3 billion in Company debt).

5.      Nonetheless, the Proposed Consideration demonstrably undervalues the Company's inherent worth, prospects and opportunities as a stand-alone entity.  Specifically, the

Board Member Defendants agreed to accept consideration equal to a meager premium, which has essentially evaporated as Wisconsin Energy's stock price has dropped in the weeks since the announcement of the Proposed Acquisition (as of August 19, 2014, the premium would be approximately 1.81%).

6.      The negligible benefit of the Proposed Acquisition to Company stockholders is rendered even less palatable in contrast to the excessive financial benefits accruing to Company insiders: cash pay-out of millions of dollars (approximately $34 million in golden parachute payments alone are possible) if the deal is executed.  Also, the Proposed Acquisition is the product of a flawed process during which the Company's Board failed to adequately consider or investigate the interest of other potential merger partners.  Since the terms of the Proposed Acquisition contemplate the sale of most, but not all, of Integrys' operating units, the Company is now under pressure to execute the piecemeal sale of an excluded unit – the energy solutions company Integrys Energy Services, which contributes approximately 5% of the Company's earnings.  To compound matters the Merger Agreement nevertheless provides numerous devices to protect the Proposed Acquisition itself, rendering the emergence of a superior proposal highly unlikely.  These devices include a no-shop provision, a force-the-vote provision, information, and matching rights to Wisconsin Energy should a superior proposal emerge, and an excessive under the circumstances termination fee of $175 million.  Additionally, the Board failed to obtain a basic safeguard for Company stock holders by neglecting to insist on a "collar" for the stock portion of the consideration, which would have protected shareholders in the event that Wisconsin Energy's stock price fell prior to the consummation of the Proposed Acquisition.

7.      In order to co-opt shareholder approval of the Proposed Acquisition, on August 13, 2014 Integrys and Wisconsin Energy have caused to be filed with the Securities and

Exchange Commission ("SEC") a registration statement, which misstates and/or omits material information concerning the merits and reasons for the Board's adoption of the Merger Agreement with Wisconsin Electric. Wisconsin Electric, Registration Statement under the Securities Act of 1933 (Aug. 13, 2014) (the "Registration Statement"). Among other things, the Registration Statement fails to provide Company shareholders with material information and/or provides them with materially misleading information concerning (i) the process leading to the Proposed Transaction, including the inherent conflicts of interest of the negotiation parties, the sale of Integrys Energy Services ("IES") and its impact on the projections and pro forma financial statements included in the Registration Statement; the projections and other financial information provided in the Registration Statement, the lack of protection for shareholders, and the need for defensive measure. In addition, the Registration Statement misstates or omits certain material information concerning the material assumptions and inputs underlying various valuation analyses performed by Lazard Frères & Co. LLC ("Lazard") and Barclays Capital Inc. ("Barclays") in connection with the preparation of their respective fairness opinions.

8. By misrepresenting and/or omitting certain material facts in the Registration Statement, Defendants have violated Sections 14(a) and 20(a) of the Exchange Act. This action seeks to enjoin the Individual Defendants from further breaching their duties in connection with the Proposed Acquisition. Plaintiff seeks: (i) a declaration that the defendants, jointly and severally, violated Sections 14(a) and/or Section 20(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder; (ii) injunctive relief preventing consummation of the Proposed Acquisition until the material disclosures described herein are provided to shareholders being asked to vote on the transaction. Plaintiff has no adequate remedy at law.

**JURISDICTION AND VENUE**

9.      This Court has jurisdiction over all causes of action asserted herein pursuant to Section 27 of the Exchange Act for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to the claims within its original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

10.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) the Company's principal executive offices are located in this District; (ii) Wisconsin Energy maintains executive offices in this District; (iii) one or more Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District and (iv) a portion of the transactions and wrongs complained of herein occurred in this District.

**PARTIES**

11.      Plaintiff Tri-State Joint Fund is based in Waterbury, Connecticut.  It is, and has been, a shareholder of Integrys at all times relevant hereto.

**A.      Corporate Defendants**

12.      Defendant Integrys is a Wisconsin corporation with its principal place of business located at 200 East Randolph Street, Chicago, Illinois 60601.  Integrys is a diversified energy holding company that manages in excess of $10 billion in assets.  The Company operates in the non-regulated energy market through a wholly owned subsidiary entitled Integrys Energy Services, and operates six regulated natural gas and electric utilities in Wisconsin, Michigan, Minnesota, and Illinois.  In addition, Integrys holds a 34% stake in American Transmission

Company LLC, an electric transmission company operating in Wisconsin, Michigan, Minnesota, and Illinois.

13.     Defendant Wisconsin Energy is a Wisconsin corporation with its headquarters located at 231 West Michigan Street, Milwaukee, Wisconsin 53201. Wisconsin Energy's regulated utilities provide gas and electric services to consumers in parts of Wisconsin and Michigan's Upper Peninsula.  These regulated utilities operate under the trade name "We Energies." Wisconsin Energy further designs, builds and owns power plants through W.E. Power, LLC and develops and invests in real estate through WISPARK, LLC. providing electric and natural gas services to customers in parts of Wisconsin and Michigan's Upper

**B.     Individual Defendants**

14.     Defendant Charles A. Schrock is, and at all material times was, Chairman, Chief Executive Officer and a director of Integrys and has served on the Board since 2010.

15.     Defendant William J. Brodsky is, and at all material times was, a director of Integrys. He serves as a member of the Compensation and Finance Committees and has served on the Board since 1997.

16.     Defendant Albert J. Budney, Jr. is, and at all material times was, a director of Integrys. He has served on the Board since 2002.

17.     Defendant Ellen Carnahan is, and at all material times was, a director of Integrys. She serves on the Audit and Environmental & Safety Committees and has served on the Board since 2003.

18.     Defendant Michelle L. Collins is, and at all material times was, a director of Integrys. She is the Chairperson of the Governance Committee, serves on the Audit Committee and has served on the Board since 2011.

19.     Defendant Kathryn M. Hasselblad-Pascale is, and at all material times was, a director of Integrys. She is the Chairperson of the Environmental & Safety Committee, serves on the Compensation Committee and has served on the Board since 1987. He is Chairperson of the Compensation Committee, serves on the Governance Committee and has served on the Board since 2003.

20.     Defendant John W. Higgins is, and at all material times was, a director of Integrys. He is Chairperson of the Compensation Committee, serves on the Governance Committee and has served on the Board since 2003.

21.     Defendant Paul W. Jones is, and at all material times was, a director of Integrys. He is Chairperson of the Finance Committee, serves on the Audit Committee and has served on the Board since 2011.

22.     Defendant Holly Keller Koeppel is, and at all material times was, a director of Integrys. She is a member of the Environmental & Safety Committee and has served on the Board since 2012.

23.     Defendant Michael E. Lavin is, and at all material times was, a director of Integrys. He is Chairperson of the Audit Committee, serves on the Compensation Committee and has served on the Board since 2003.

24.     Defendant William F. Protz, Jr. is, and at all material times was, a director of Integrys. He is a member of the Environmental & Safety and Financial Committees, and has served on the Board since 2001.

25.     The Defendants in ¶¶ 14-24 are sometimes referred to in as the Integrys "Board" or the "Board Member Defendants."

26.     Defendant Gale E. Klappa is the Chairman of the Board, Chief Executive Officer and Director of Wisconsin Energy since 2004.  Mr. Klappa signed the Registration Statement on Behalf of Wisconsin Electric.

27.     The defendants identified in ¶¶ 14-26 above are sometimes collectively referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

28.     Plaintiff brings this action on its own behalf and as a class action on behalf of all holders of Integrys stock who are being and will be harmed by Defendants' actions described herein (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendants.

29.     This action is properly maintainable as a class action.

30.     The Class is so numerous that joinder of all members is impracticable.  According to the Company's filings with the U.S. Securities and Exchange Commission ("SEC"), as of June 19, 2014, there were more than 79.9 million shares of common stock outstanding.  These shares are held by hundreds, if not thousands, of beneficial holders.

31.     There are multiple questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member, including:

> (a)     whether the Registration Statement contains material misstatements or omissions in violation of sections 14(a) and 20(a) of the Exchange Act; and
>
> (b)     whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Acquisition consummated without the wrongdoing complained of herein being corrected.

32.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

33.    Plaintiff has retained competent counsel experienced in litigation of this nature and will fairly and adequately represent and protect the interests of the Class.

34.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

35.    Plaintiff anticipates that there will be no difficulty in the management of this litigation.  Indeed, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

36.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought with respect to the Class as a whole.

## BACKGROUND

37.     Integrys is a holding company headquartered in Chicago, Illinois, whose operating subsidiaries provide natural gas and electricity in regulated and nonregulated markets. The Company provides electricity and natural gas solutions to commercial, industrial and residential customers in more than 20 states across the northeast quadrant of the U.S.  Integrys' performance over the last 18 months has given the market and Company investors every reason to believe that Integrys' future as a stand-alone company is bright.

38.    On February 28, 2013, after announcing financial results for the year ended December 31, 2012, Integrys projected for 2013 adjusted diluted earnings per share ("EPS") of $3.05 to $3.55, which Integrys ultimately achieved.

39.    On May 1, 2013, the Company released earnings for the first quarter of 2013.  For 1Q 2013, adjusted earnings (defined as income from continuing operations before income taxes)

were $139.9 million, up from $123.3 million for the same period in 2012.  EPS was also higher at $1.76 per share, as compared to $1.56 per share for the same period in 2012.

40.     On August 5, 2013, Integrys reported earnings for the second quarter of 2013. Adjusted earnings grew almost 65% to $35.7 million as compared to the same quarter in 2012, and EPS was $0.45 per share, as compared to $0.27 per share for the same quarter in 2012.

41.     On February 26, 2014, Integrys reported financial results for the fourth quarter of 2013 and full year 2013.  For 4Q 2013, adjusted earnings were $79.5 million, as compared to $70.2 million for the same period in 2012, and EPS was $0.99 per share, as compared to $0.89 per share for the same period in 2012.  For full year 2013, EPS was $3.53 per share (*i.e.*, at the upper range of the Company's financial forecast in February 2013).

42.     For 2014, the Company's first quarter 2014 earnings news release (May 1, 2014) set the Company's guidance range for adjusted diluted earnings per share at $3.50 to $3.75, and there has been good reason all year for the market to adopt the Company's optimism for its prospects as a stand-alone operation.

43.     For instance, on January 31, 2014, *Moody's* upgraded its issuer ratings on Integrys' three rated utility subsidiaries, including the Wisconsin Public Service Corporation which was upgraded from A2 to A1, Peoples Gas Light and Coke Company ("PGLCC") (from A3 to A2), and North Shore Gas Company (from A3 to A2).  The PGLCC's commercial paper rating was concomitantly upgraded from P-2 to P-1.

44.     In addition, Integrys' recent earnings have been particularly solid.  On May 2, 2014, Integrys reported results for the first fiscal quarter of 2014 (ended March 31, 2014), which included a 74.3% increase in revenue year over year to $2,924.9 million.  Reported revenue also comfortably beat *Zack*s consensus estimate by an impressive 79.4%.  The increased revenue

figures represented a 136% sales increase from the Company's non-regulated business, and a 43.8% sales increase from the Company's regulated business.

## THE PROPOSED ACQUISITION

45.     On June 23, 2014, notwithstanding the Company's positive financial results and substantial momentum in the energy market, all of which auger in favor of the Company as a strong standalone candidate, Integrys and Wisconsin Energy announced they entered into a definitive agreement to sell the Company to Wisconsin Energy for an estimated $9.1 billion in cash, stock and assumed debt.

46.     According to the June 23, 2014 announcement, transaction value is the sum of an anticipated $5.8 billion share purchase, and assumption of $3.3 billion of Integrys debt. The purchase will be 74% equity and 26% cash. The Proposed Acquisition provides for payment of $18.58 dollars and 1.128 Wisconsin Energy shares for each Integrys share proffered in the deal. The June 23, 2014, announcement states in part:

> Under the terms of the transaction, which has been unanimously approved by the boards of directors of both companies, Integrys shareholders will receive common stock at a fixed exchange ratio of 1.128 Wisconsin Energy shares plus $18.58 in cash per Integrys share.
> Total consideration is valued at $71.47 per Integrys share, with a consideration mix of 74 percent stock and 26 percent cash. This represents a 17.3 percent premium to Integrys' closing price on June 20, 2014 and a 22.8 percent premium to the volume-weighted average share price over the past 30 trading days ending June 20, 2014. Upon closing of the transaction, Integrys shareholders will own approximately 28 percent of the combined company.

## FAILURE TO MAXIMIZE SHAREHOLDER VALUE

47.     Rather than permitting the Company's stock to reap the benefits of the Company's growth strategy, the Board Member Defendants have acted for their personal benefit and to the detriment of the Company's public stockholders by entering into the Merger Agreement. In so

11

doing, the Board Member Defendants have placed a cap on Integrys' corporate value at a time when the Company is primed for future growth. Indeed, Integrys stockholders will only own 28% of the combined entity going forward.

48.    Unfortunately for public stockholders of the Company, Wisconsin Energy shares have reflected increased volatility in the days following the announcement, and the failure of the Company to provide for a collar in the Merger Agreement puts stockholders at risk of receiving substantially less for their proffered shares than advertised.

49.    Specifically, the Merger Agreement's fixed exchange ratio of 1.128 Wisconsin Energy shares per one Integrys share pins the value of each Wisconsin Energy share at approximately $46.89.   But in the day's following the announcement of the Proposed Acquisition, the closing price of Wisconsin Energy stock has fallen as low as $44.91 (July 3, 2014).  Here, had the Company incorporated a "collar" into the agreement, the 17.3% premium advertised by the Company could be preserved.  Due to the omission of a collar device on the stock portion of the Proposed Acquisition consideration, the total consideration value is subject to plunge.

**INADEQUATE PROTECTION FOR PUBLIC STOCKHOLDERS**

50.    In its announcement of the Proposed Acquisition, the Company's chairman and Chief Executive Officer, Charlie Schrock, boasts that:

> "Wisconsin Energy is consistently ranked as one of the best companies in the nation for reliability and customer satisfaction. With compatible operational philosophies and Wisconsin Energy's demonstrated commitment to reliability, customer satisfaction, safety and environmental stewardship, Wisconsin Energy is a great partner for Integrys. Our shareholders will receive an attractive premium for their investment and will also benefit from the opportunity to participate in the upside of the combination, including future value creation and a growing dividend program. . . . ."

12

51.     However, in the event that the Proposed Acquisition is executed when Wisconsin Energy stock has fallen to the level of its most recent post-announcement low, on July 3, 2014, Integrys shareholders would receive equity in Wisconsin Energy worth only $50.66 for each of their tendered Integrys shares, amounting to total consideration of $69.24 per share instead of the announced figure of $71.47.  Based on the closing price of Company stock on June 20, 2014, the Proposed Acquisition consideration would amount to a paltry 13.6% premium, and not the 17.3% premium advertised in the Company's announcement.

52.     The Company's Board and senior management have apparently decided that a collar provision in the Merger Agreement is not in the best interest of the Company, its stockholders and its other constituents.

### THE SELF-DEALING AND WINDFALL TO INDIVIDUAL DIRECTORS

53.     One explanation for the Integrys Board's omission of a fundamental stockholder protective device is that members of the Board and of senior management stand to profit from the Proposed Acquisition regardless of whether or not the deal nets a fair premium to Plaintiff and other holders.   While consideration accruing to members of the Board and senior management for their proffered shares is also dependent on the market's treatment of Wisconsin Energy stock, these individuals stand to gain from the Proposed Acquisition regardless of how low Wisconsin Energy shares fall: the Proposed Acquisition will net the Executive Officers of Integrys over $33,000,000 in golden parachute payments alone:

Potential Change in Control Payments to Named Executive Officers

| Name | Cash ($)(1) | Equity ($)(2) | Pension(3) | Total ($)(4) |
|---|---|---|---|---|
| *Named Executive Officers* | | | | |
| Charles A. Schrock | 6,292,906 | 6,821,960 | 0 | 13,114,866 |
| James F. Schott | 1,644,800 | 1,427,517 | 0 | 3,072,317 |
| Lawrence T. Borgard | 3,493,300 | 3,141,008 | 2,991,224 | 9,625,532 |
| Phillip M. Mikulsky | 1,681,957 | 1,627,879 | 0 | 3,309,836 |
| Mark A. Radtke | 2,209,026 | 1,595,360 | 1,212,124 | 5,016,510 |

Registration Statement at 95.

54.     In the aggregate, Mr. Schrock stands to receive up to $41,687,807 upon the consummation of the Proposed Acquisition.  This includes the $13,114,966 in golden parachute payments referenced above alone.  *See* Registration Statement at 94.  Another member of the Board, William F. Protz, Jr. stands to make $13,481,495 from the consummation of the transaction with Wisconsin Energy.  Indeed, eight (8) members of the 11-member Integrys Board stand to make over $1,000,000 as a result of the consummation of the consummation of the Proposed Acquisition, with four (4) receiving over $2,000,000:

| Name | Integrys Equity Awards | | | |
|---|---|---|---|---|
| | Vested and Unvested Stock Options (#) | RSUs (#) | Deferred Stock Units (#) | Amount ($) |
| *Executive Officers* | | | | |
| Charles A. Schrock | 554,924 | 69,967 | 105,800 | 23,580,352 |
| James F. Schott | 76,484 | 14,424 | 6,528 | 2,791,056 |
| Lawrence T. Borgard | 166,362 | 33,480 | 29,865 | 7,049,587 |
| Phillip M. Mikulsky | 46,084 | 17,584 | 35,807 | 4,410,093 |
| Mark A. Radtke | 93,303 | 17,233 | 28,707 | 4,854,458 |
| Linda M. Kallas | 28,423 | 4,802 | 0 | 812,061 |
| William J. Guc | 18,077 | 4,472 | 4,738 | 928,574 |
| William D. Laakso | 34,230 | 6,423 | 3,729 | 1,309,117 |
| Jodi J. Caro | 51,136 | 11,869 | 0 | 1,767,116 |
| Daniel J. Verbanac | 61,904 | 14,676 | 28,554 | 4,042,143 |
| Charles A. Cloninger | 27,678 | 6,520 | 5,048 | 1,256,703 |
| William E. Morrow | 9,782 | 3,960 | 0 | 421,436 |
| *Directors* | | | | |
| William J. Brodsky | 0 | 0 | 36,225 | 2,521,985 |
| Albert J. Budney, Jr. | 0 | 0 | 20,611 | 1,434,938 |
| Ellen Carnahan | 0 | 0 | 29,886 | 2,080,663 |
| Michelle L. Collins | 0 | 0 | 9,069 | 631,384 |
| Kathryn M. Hasselblad-Pascale | 0 | 0 | 26,290 | 1,830,310 |

| | | | | |
|---|---|---|---|---|
| John W. Higgins | 0 | 0 | 14,003 | 974,889 |
| Paul W. Jones | 0 | 0 | 4,953 | 344,828 |
| Holly Keller Koeppel | 0 | 0 | 5,853 | 407,486 |
| Michael E. Lavin | 0 | 0 | 14,003 | 974,889 |
| William F. Protz, Jr. | 0 | 0 | 37,226 | 2,591,674 |

Registration Statement at 92.

| Name | Shares Beneficially Owned (#) | Aggregate Merger Consideration ($) |
|---|---|---|
| *Executive Officers* | | |
| Charles A. Schrock | 71,712 | 4,992,589 |
| James F. Schott | 8,101 | 563,992 |
| Lawrence T. Borgard | 23,225 | 1,616,925 |
| Phillip M. Mikulsky | 15,036 | 1,046,806 |
| Mark A. Radtke | 39,530 | 2,752,079 |
| Linda M. Kallas | 12,692 | 883,617 |
| William J. Guc | 7,426 | 516,998 |
| William D. Laakso | 10,793 | 751,409 |
| Jodi J. Caro | 9,730 | 677,403 |
| Daniel J. Verbanac | 14,204 | 988,882 |
| Charles A. Cloninger | 8,987 | 625,675 |
| William E. Morrow | 10,051 | 699,751 |
| *Directors* | | |
| William J. Brodsky | 3,914 | 272,493 |
| Albert J. Budney, Jr. | 3,700 | 257,594 |
| Ellen Carnahan | 2,265 | 157,689 |
| Michelle L. Collins | 200 | 13,924 |
| Kathryn M. Hasselblad-Pascale | 4,945 | 344,271 |
| John W. Higgins | 0 | 0 |
| Paul W. Jones | 2,200 | 153,164 |
| Holly Keller Koeppel | 0 | 0 |
| Michael E. Lavin | 5,378 | 374,416 |
| William F. Protz, Jr. | 156,418 | 10,889,821 |

Registration Statement at 90.

    55.    Similarly, James F. Schott (the Company's Chief Financial Officer), Lawrence T. Borgard (the Company's Chief Operating Officer), Phillip M. Mikulsky (the Company's Chief Security Officer), and Mark A. Radtke (the Company's Chief Strategy Officer) stand to potentially receive over $7,000,000, $18,000,000, $8,000,000, and $12,000,000, respectively, once the Proposed Acquisition is consummated.

15

56.     The aforementioned lucrative payments cast substantial doubt that the process leading to the announcement of the Proposed Acquisition was fair, unbiased, or conducted in good faith.

## THE PRECLUSIVE DEAL PROTECTION DEVICES

57.     The Board Member Defendants have also agreed to certain deal protection devices that ensure that the Proposed Acquisition is successful and that no competing offers will emerge for the Company. The Merger Agreement contains certain deal-protection provisions that essentially preclude superior competing proposals for the Company and stymie any erstwhile auction process.

58.     First, a no-solicitation provision which strictly prohibits Integrys from soliciting or initiating any inquiries or proposals for the Company, barring the Company from actively pursuing a superior bid.  As the Merger Agreement provides in pertinent part:

> *No Solicitation by the Company; Company Board Recommendation.*    (a) The Company shall not, and shall not authorize or permit any of its Affiliates to, and shall instruct, and shall cause its Affiliates to instruct, its and their respective Representatives not to, (i) directly or indirectly solicit, initiate, knowingly encourage, induce or knowingly facilitate any Company Takeover Proposal or any inquiry or proposal that could reasonably be expected to lead to a Company Takeover Proposal or (ii) directly or indirectly participate in any discussions or negotiations with any Person (other than the Company's Representatives) regarding, or furnish to any Person any information with respect to, or cooperate in any way with any Person (whether or not such Person is making a Company Takeover Proposal) with respect to any Company Takeover Proposal or any inquiry or proposal that may reasonably be expected to lead to a Company Takeover Proposal. The Company shall, and shall cause its Affiliates and its and their respective Representatives to, immediately cease and cause to be terminated all existing discussions or negotiations with any Person conducted heretofore with respect to any Company Takeover Proposal, or any inquiry or proposal that may reasonably be expected to lead to a Company Takeover Proposal, request the prompt return or destruction of all confidential information previously furnished and immediately terminate all physical and electronic data room access previously granted to any such Person or its Representatives. Notwithstanding the foregoing, at any time prior to obtaining the Company Shareholder Approval, in response to a *bona fide* written Company Takeover Proposal that the Company Board

16

determines in good faith (after consultation with outside legal counsel and a financial advisor of nationally recognized reputation) constitutes or would reasonably be expected to lead to a Superior Company Proposal, and which Company Takeover Proposal was not solicited by the Company, its Affiliates or Representatives after the date of this Agreement and was made after the date of this Agreement and did not otherwise result from a breach of this Section 5.03(a), the Company, and its Representatives at the request of the Company, may, subject to compliance with Section 5.03(c), (A) furnish information with respect to the Company and the Company Subsidiaries to the Person making such Company Takeover Proposal (and its Representatives) (*provided* that all such information has previously been provided to Parent or is provided to Parent prior to or substantially concurrent with the time it is provided to such Person) pursuant to a customary confidentiality agreement not less restrictive of such Person than the Confidentiality Agreement, and (B) participate in discussions regarding the terms of such Company Takeover Proposal and the negotiation of such terms with, and only with, the Person making such Company Takeover Proposal (and such Person's Representatives). Without limiting the foregoing, it is agreed that any violation of the restrictions set forth in this Section 5.03(a) by any Representative of the Company or any of its Affiliates shall constitute a breach of this Section 5.03(a) by the Company.

Registration Statement at A-47. Accordingly, Integrys is essentially foreclosed from soliciting any offer, under any circumstances and, even in the unlikely event that an unsolicited offer were to emerge, the circumstances under which the Integrys Board could entertain, much less accept such an offer are extremely narrow.

59. Second, the Merger Agreement severely restricts the circumstances in which the Company may enter into discussions concerning a takeover proposal to circumstances in which the failure to participate in such discussions would constitute a breach of the fiduciary duty by the Board. And, should a takeover proposal emerge, Wisconsin Energy has the right to amend its terms and make a counter-offer, which Integrys must consider before it may determine that the takeover bid constitutes a superior proposal (commonly known as a "matching rights provision").

60.     Third, the Merger Agreement provides for a termination fee of $175 million plus expenses if the Company pursues another offer, penalizing the alternative bidder for the right to provide stockholders with a superior offer.

61.     Fourth, Integrys has not opted out, for the purposes of the Proposed Acquisition or otherwise, from a number of provisions of Wisconsin law which would severely restrict the ability of an interested part to launch a hostile takeover of Integrys.   As the Registration Statement Provides:

*Control Share Acquisitions*

Wisconsin law provides that, unless a corporation's articles of incorporation provide otherwise, the voting power of shares of a "resident domestic corporation" such as Wisconsin Energy or Integrys held by any person (including two or more persons acting as a group) in excess of 20 percent of the voting power in the election of directors is limited (in voting on any matter) to 10 percent of the full voting power of those shares. This restriction does not apply to shares acquired directly from the resident domestic corporation, or in certain specified transactions, or incident to a transaction in which the corporation's shareholders have approved restoration of the full voting power of the otherwise restricted shares.

Under its charter, Wisconsin Energy has opted out of this control share acquisition restriction. **Integrys has not opted out of such restriction.**

\* \* \*

*Fair Price Provisions*

Wisconsin law provides that in addition to any approval otherwise required, certain mergers, share exchanges or sales, leases, exchanges or other dispositions involving a resident domestic corporation, such as Integrys or Wisconsin Energy, and any significant shareholder are subject to a super-majority vote of shareholders unless certain fair price standards have been met. For this purpose a significant shareholder is defined as either a 10 percent shareholder or an affiliate of the resident domestic corporation who was a 10 percent shareholder at any time within the preceding two years. The super-majority vote that is required by the statute consists of:

• approval of 80 percent of the total voting power of the corporation, and

• approval of at least $66^2/_3$ percent of the voting power not beneficially owned by the significant shareholder or its affiliates or associates.

However, a supermajority vote is not required if the following "fair price" standards are satisfied:

• the consideration is in cash or in the form of consideration used to acquire the greatest number of shares, and

•the     amount     of     the     consideration     equals     the     greater     of:

a) the highest price paid by the significant shareholder within the prior two-year period;

b) in the case of a tender offer, the market value of the shares on the date the significant shareholder commences the tender offer; or

c) the highest liquidation or dissolution distribution to which the shareholders would be entitled.

**Neither Wisconsin Energy nor Integrys has opted out of the restrictions above.** The Wisconsin Energy charter further requires an affirmative vote by 80 percent of the aggregate number of votes that holders of Wisconsin Energy common stock and preferred stock are entitled to cast on a charter amendment (and the same percentage of any separate class vote of holders of shares of such a class or series so entitled to vote under the Wisconsin Energy charter or Wisconsin law as a class) if that amendment would have the effect of opting out of the fair price provisions.

Registration Statement at 167-168 (emphasis added).   As the portions of the Registration Statement quoted above reflect, Integrys could have opted out of either of these provisions as part of the Proposed Acquisition in order to allow potential third-party bidders a better opportunity to acquire the Company.   They decided not to, thereby further insulating the Proposed Acquisition from any potential competition.

62.     These provisions unduly bind the Board to the Proposed Acquisition and make it highly unlikely that the Board will fulfill its fiduciary duties in the future without this Court's intervention.

**THE FALSE AND MATERIALLY MISLEADING REGISTRATION STATEMENT**

63. In an attempt to secure shareholder approval of the unfair Proposed Acquisition, Safeway filed the false and misleading Registration Statement with the SEC on August 18, 2014. As detailed herein, the Registration Statement misrepresents and/or omits material information necessary for Integrys shareholders to make an informed decision regarding whether to vote in favor of the Proposed Acquisition - a direct contravention of Sections 14(a) and 20(a) of the Exchange Act.

64. Specifically, the Registration Statement fails to provide Company shareholders with material information and/or provides them with materially misleading information concerning (i) the process leading to the Proposed Acquisition, including the inherent conflicts of interest of the negotiation parties, the projections and other financial information provided in the Registration Statement, the lack of protection for shareholders, and the need for defensive measures. In addition, the Registration Statement misstates or omits certain material information concerning the material assumptions and inputs underlying various valuation analyses performed by Lazard in connection with the preparation of their respective fairness opinions.

A. **Material Misstatement Concerning Defendants Reasons for Approving the Proposed Acquisition**

1. **Misstatements and Omissions Concerning the Lack of a Sales Process**

65. The Registration Statement paints a picture of a process that was dominated by contacts with Wisconsin Energy, to the exclusion of other parties. However, certain information which would be material to shareholders in deciding to vote in favor of the Proposed Acquisition has been misstated and/or omitted. This includes information concerning, among other things, the amount of Board involvement in the sales process, the role of Mr. Schrock in negotiating the

sale of the Company and the failure of the Integrys Board to insist that other interested bidders be contacted before committing to a sale to Wisconsin Energy.

66.     As the Registration Statement suggests, the first contact that took place between Wisconsin Energy and Integrys occurred in December of 2013, when Mr. Klappa of Wisconsin Energy telephoned Mr. Schrock:

> On December 9, 2013, Mr. Klappa telephoned Mr. Charles A. Schrock, Chairman and Chief Executive Officer of Integrys, to request a meeting with him. During this discussion, Mr. Klappa briefly described to Mr. Schrock Wisconsin Energy's general interest in exploring a possible transaction with Integrys. Mr. Schrock also informed Lazard about Wisconsin Energy's interest and confirmed that Lazard was free from any conflicts of interest that would impair Lazard's ability to advise Integrys with respect to any such potential transaction. Given Lazard's familiarity with Integrys and the industry landscape, Integrys senior management determined to request the Integrys Board to engage Lazard as financial advisor in connection with the potential transaction with Wisconsin Energy, subject to negotiation of an acceptable fee arrangement.

Registration Statement at 39.  It is telling that, instead of sending a written communication to the Integrys Board indicating an interest in pursuing a transaction with the Company, Mr. Klappa instead endeavored to contact Mr. Schrock directly.  This type of personal communication suggests that there was a pre-existing, and possibly friendly, relationship between Mr. Klappa and Mr. Schrock.  However, the Registration Statement is silent as to any pre-existing relationship between Mr. Klappa and Mr. Schrock, friendly or otherwise.  Given the small sphere of electric and natural gas providers in the Midwest, it would be absurd to conclude that Mr. Klappa and Mr. Schrock were not at least acquainted prior to the December 9, 2013 communication described in the Registration Statement.

67.     Similarly, the Registration Statement is silent as to what happened after Mr. Schrock was informed of Mr. Klappa and Wisconsin Energy's indication of interests in pursuing a transaction with Integrys.  The Registration Statement skips three days in between Mr.

Schrock's being informed of Wisconsin Energy's interest and his informing the Board of such interest:

> On December 12, 2013, the Integrys Board held a regularly scheduled meeting at which representatives of Lazard were present. At the meeting, the Integrys Board met in executive session with Mr. Schrock present, during which Mr. Schrock informed the Integrys Board of Wisconsin Energy's general interest in exploring a possible transaction with Integrys.

Registration Statement at 40. It is virtually inconceivable that Mr. Schrock kept Wisconsin Energy's indication of interest to himself during the three days between December 9 and December 12, 2013. Due to the overwhelming influence that Mr. Schrock held over the sales process and eventual sale of Integrys to Wisconsin Energy, the parties that Mr. Schrock contacted before informing the Board of the indication of interest are extremely material. For instance, if Mr. Schrock informed certain Board members, but not others, that would be important for shareholders to know. If Mr. Schrock informed certain members of management about the indication of interest ahead of informing the Board, that also would be pertinent. What is clear is that Mr. Schrock informed Lazard of the Wisconsin Energy indication prior to informing the Board, because Lazard was present at the December 12, 2013 meeting. When Lazard was informed and what discussions took place concerning the indication would certainly be important to shareholders.

68. From the moment of the first phone call from Mr. Klappa to Mr. Schrock on December 9, 2013, it is clear that Mr. Schrock—not Lazard, not any other Board member—was the spearhead of the sales process. The Registration Statement catalogues numerous dinner meetings, phone calls and regular communications between Mr. Scrock and Mr. Klappa personally. Indeed, it is clear that the Proposed Acquisition was essentially negotiated between Mr. Scrock and Mr. Klappa:

On December 9, 2013, Mr. Klappa telephoned Mr. Charles A. Schrock, Chairman and Chief Executive Officer of Integrys, to request a meeting with him.

* * *

On December 18, 2013, Messrs. Klappa and Schrock met for dinner.

* * *

On January 15, 2014, Mr. Schrock telephoned Mr. Klappa in response to their discussion at their December 18, 2013 dinner meeting.

* * *

On January 22, 2014, Mr. Schrock telephoned Mr. Klappa to discuss the January 20, 2014 UPPCO sale announcement.

* * *

On February 20, 2014, Mr. Schrock telephoned Mr. Klappa to request a meeting to further discuss a potential transaction.

* * *

On March 4, 2014, Messrs. Klappa and Schrock met. At the meeting, Messrs. Klappa and Schrock mutually agreed to proceed to evaluate a potential acquisition of Integrys by Wisconsin Energy.

* * *

On March 7, 2014 . . . Mr. Schrock informed Mr. Klappa that since late 2013 Integrys has been planning the divestiture of certain of its non-regulated businesses and would continue to pursue this divestiture.

* * *

On April 16, 2014, Messrs. Klappa and Schrock spoke over the telephone regarding the status of discussions to date and a timeline and process for continued evaluation of a potential transaction.

* * *

On April 23, 2014, Messrs. Klappa and Schrock met.

* * *

23

On April 30, 2014, Mr. Schrock telephoned Mr. Klappa to request a revised proposal from Wisconsin Energy that would provide for two alternative consideration structures to address the contingent nature of the sale of IES.

* * *

On May 7, 2014, at the direction of Messrs. Klappa and Schrock, members of the senior management of Wisconsin Energy and Integrys held a teleconference to review and discuss the updated non-binding indication of interest letter, which provided for two alternative structures of consideration to be paid to Integrys shareholders and updated the proposed valuation based on current respective share prices.

* * *

On May 13, 2014, Messrs. Klappa and Schrock spoke by telephone. Mr. Schrock advised Mr. Klappa that he would be discussing the updated non-binding indication of interest letter with the Integrys Board at their May 15, 2014 meeting.

* * *

On May 16, 2014, Mr. Schrock telephoned Mr. Klappa and reported that the Integrys Board had discussed the potential transaction and authorized management to proceed to negotiate a definitive merger agreement.

* * *

On June 3, 2014, Messrs. Klappa and Schrock spoke about the status of the draft merger agreement.

* * *

On June 5 and June 6, 2014, Messrs. Klappa and Schrock spoke about the significant issues raised in the draft merger agreement.

* * *

On June 13, 2014, members of Wisconsin Energy's and Integrys' senior management teams, including Messrs. Klappa and Schrock, along with their respective outside legal counsel and financial advisors, participated in a teleconference during which they discussed the status of several issues, including the federal regulatory analysis, rating agency feedback, regulatory strategy and open issues in the merger agreement.

* * *

On June 13 and June 14, 2014, and every day from June 16, 2014 until the execution of the merger agreement on June 22, 2014, Messrs. Klappa and Schrock spoke about the outstanding issues in the draft merger agreement, including the provisions in the merger agreement relating to the regulatory approval process and associated conditions to closing of the transaction.

\* \* \*

On June 17, 2014, Mr. Schrock telephoned Mr. Klappa to provide him with a summary of the meeting of the Integrys Board held on June 16, 2014.

\* \* \*

On June 18, 2014, Messrs. Klappa and Schrock spoke again via telephone. Messrs. Klappa and Schrock discussed several key transaction issues relating to valuation of Integrys, the amount of a proposed termination fee, the treatment of equity awards, the number of Integrys directors to be appointed to the board of the combined company, the size of the retention pool and the sale of the IES Retail Business.

\* \* \*

On June 21, 2014, the Integrys Board held a special telephonic meeting for the purpose of [approving] the Proposed Transaction with Wisconsin Energy. . . . Following the meeting of the Integrys Board, Mr. Schrock telephoned Mr. Klappa and informed him of the action taken by the Integrys Board.

Registration Statement at 39-50. What is not disclosed in the Registration Statement is at what point the Board determined that it was beneficial for shareholders for Mr. Schrock to be given the authority to essentially negotiate the sale of Integrys to Wisconsin Energy on his own. Similarly, the Registration Statement is silent as to what deliberations, if any, took place regarding the desirability of Mr. Schrock acting as the personal spokesperson of the Board in conjunction with the negotiation of the sale of the Company. In particularly, there is no discussion in the Registration Statement of the consideration that the Board gave, if any, to the pernicious conflicts of interest that management, and Mr. Schrock personally, had concerning a sale of the Company to Wisconsin Energy. For instance, as discussed in more detail *infra*, missing is any discussion of the Board's consideration at any point in 2013 or 2014 of the over

$18 to $23 million in 'golden parachute' and other payments that Mr. Schrock stood to gain as a result of the consummation of the Proposed Acquisition, as well as the millions of dollars that other members of the Board and management stood to make from the transaction.

69.    As early as February 13, 2014, the Integrys Board made a determination not to contact other parties which may potentially be interested in acquiring the Company.  As the Registration Statement sets forth, Lazard came up with a very truncated list of potential bidders, but the Board decided to forego contacting even that 'short list' of potential buyers in order to continue with its favored party, Wisconsin Energy:

> On February 13, 2014, the Integrys Board held a regularly scheduled meeting at which representatives of Lazard were present. Mr. Schrock summarized his communications with Mr. Klappa since December 18, 2013. A representative of Lazard provided an overview of Integrys' management plan and potential strategic alternatives that could complement Integrys' long-term financial and strategic plan. A representative of Lazard reviewed selected potential strategic alternatives with potential counterparties, which included four strategic buyers, three potential merger parties and one potential strategic target. The representative also discussed a potential take private alternative. The representative discussed with the Integrys Board Lazard's preliminary analysis of a potential transaction with each such counterparty and the industrial logic of a potential transaction. The representative of Lazard also reviewed Lazard's views on the likely strategic interest of each such counterparty of a potential M&A transaction, in general and specifically with respect to Integrys, as well as the likely ability of such counterparty to consummate a potential transaction and the perceived likelihood that any such counterparty would approach Integrys with a proposal offering better value than Wisconsin Energy's proposal. The Integrys Board discussed the likelihood of any other of the identified potential buyers making an offer for Integrys that would represent more value to Integrys' shareholders than Wisconsin Energy's proposal and discussed the strong strategic rationale of a transaction with Wisconsin Energy. After discussion, during which the Integrys Board also considered the risk of a leak if any of the potential buyers were contacted and the risk to Wisconsin Energy's proposal posed by that leak, the Integrys Board determined that it would defer a decision about whether to contact other potential counterparties until it had more clarity with respect to Wisconsin Energy's proposal.

Registration Statement at 40-41. As reflected above, the sole disclosed reason given for not contacting other parties was that doing so would pose the risk of a "leak." *Id.* at 41. However, the Registration Statement does not relate any other reasons given for not contacting additional potential buyers. For instance, the Registration Statement fails to discuss whether the Board or its advisors suggested—as they should have—the use of a confidentiality or standstill agreement to insulate the Company from any potential "leak" by the third parties contacted. Such agreements are ubiquitous in the mergers and acquisitions area and are specifically designed to ensure that any parties contacted during the sales process do not disclose confidential information concerning the company or the sales process. Accordingly, it is nearly inconceivable that the Board was not alerted to this possible solution to the "leak" problem. What is missing from the Registration Statement is the true reasons for not contacting third parties, *e.g.*, that the Board—or specific members of the Board, for example, Mr. Schrock—had already decided that Wisconsin Energy was its preferred buyer and contacting third parties would be an exercise in futility given this preference.

> **2. Misstatement and Omissions Concerning the Interests of Defendants and Integrys Executives in the Proposed Acquisition**

70. Strikingly, the Background of the Merger section is silent as to any consideration, discussion, or inquiry of the Integrys Board into any of the serious conflicts of interest by any members of the Board or Management concerning the negotiation and consummation of a Merge Agreement with Wisconsin Energy.

71. As discussed *supra*, Mr. Schrock and the members of the Board and management stand to benefit handsomely from the consummation of the Proposed Acquisition. For example, in the aggregate, Mr. Schrock stands to receive up to $41,687,807 upon the consummation of the Proposed Acquisition. This includes the $13,114,966 in golden parachute payments referenced

above alone.  *See* Registration Statement at 94.  Another member of the Board, William F. Protz, Jr. stands to make $13,481,495 from the consummation of the transaction with Wisconsin Energy.  Indeed, eight (8) members of the 11-member Integrys Board stand to make over $1,000,000 as a result of the consummation of the Proposed Acquisition, with four (4) receiving over $2,000,000.  Similarly, James F. Schott (the Company's Chief Financial Officer), Lawrence T. Borgard (the Company's Chief Operating Officer), Phillip M. Mikulsky (the Company's Chief Security Officer), and Mark A. Radtke (the Company's Chief Strategy Officer) stand to potentially receive over $7,000,000, $18,000,000, $8,000,000, and $12,000,000, respectively, once the Proposed Acquisition is consummated.

72.     Nonetheless, aside from a cursory and boilerplate admonition that the Board "considered" the interests of the Directors and Executive Officers identified above when approving the Proposed Acquisition, there is no discussion of what was considered or why such pernicious conflicts of interests were overlooked.  *See* Registration Statement at 88-89. In addition, there is not description of what prophylactic measures, if any, were put in place—or even considered—to ensure that members of the Board and management with extremely large stakes in the consummation of the Proposed Acquisition were sequestered from taking part in negotiations or limited as to their role in setting the financial or other terms of the transaction with Wisconsin Energy.

73.     As discussed above, Mr. Schrock was the leading figure in personally negotiating the Proposed Acquisition with representatives of Wisconsin energy, despite his enormous—as much as $41 million stake—in the outcome of those negotiations.  However, the Registration Statement is silent as to whether those conflicts were considered in setting out the terms that would bind shareholders, much less whether he was asked to abstain from voting on the adoption

of the Merger Agreement. Indeed, it is unclear whether the Board was even aware of the abnormally large stake that Mr. Schrock had in the outcome of the negotiations with Wisconsin Energy at the time he was negotiating those terms. To the same extent, the Registration Statement is silent as to whether the Board considered the conflicts that burdened other Board members and members of management, particularly in their support of a transaction with Wisconsin Energy.

74. The materiality of such information is clear from the repeated refusal of the Integrys Board to even take the extremely small step of **even contacting** any other potential buyers in an effort to determine whether the deal being proposed by Wisconsin Energy was fair or reasonable to Integrys shareholders. As the Registration Statement sets forth, on two separate occasions the idea of contacting potential interested parties—Lazard had reportedly "reviewed selected potential strategic alternatives with potential counterparties, which included four strategic buyers, three potential merger parties and one potential strategic target"—was broached and the Board refused to contact those parties. Registration Statement at 40. One reason given for not even contacting those parties was the threat of a "leak," which as discussed above was misleading and unreasonable given the ability of the Board to request confidentiality from any third party contacted.

75. The other rationale given is that it was "highly unlikely that any such third parties would propose a transaction exceeding the value proposed by Wisconsin Energy at that time." Registration Statement at 46. This reason is also facially misleading and unreasonable. Aside from telepathy, the Integrys Board had no possible way to know that it was "unlikely" that any third party, including those identified previously by Lazard, would be able to offer more for Integrys. The real reasons for the Board's continued and systematic decision not to contact

potential third-party buyers is undisclosed. Shareholder can only guess at the true reasons, whether they are self-interested, grossly negligent or a combination of the two.

76. Relatedly, as the Registration Statement reflects, a special committee of the Integrys Board was never convened. Given the serious conflicts of interests that existed between and among Mr. Schrock, the Board and Company Management throughout the sales process, the decision not to convene a special committee to help insulate the process leading up to the Proposed Acquisition from these conflicts is disconcerting. The Registration Statement is silent as to: (1) whether the Board or its advisors, at any point, suggested the implementation of a special committee to protect the sales process from debilitating conflicts of interests; (2) if the use of a special committee was suggested, at any point in the process, why the Board felt that a special committee would not be desirable under the circumstances; and (3) if a special committee was not suggested or recommended, how the Board—during its deliberations leading up to the approval of the Proposed Acquisition—addressed the serious conflicts of interest that burdened Mr. Schrock and other members of the Board and Management.

77. It is true that a "Transaction Committee" was formed. However, the Transaction Committee's remit was not to protect shareholders. Instead, it was designed specifically to "oversee and work together with management in connection with Integrys' exploration of a strategic transaction **with Wisconsin Energy**." Registration Statement at 46. In essence, the Transaction Committee was formed to simply ink the Agreement and Plan of Merger well after the sale of Integrys to Wisconsin Energy was a *fait acommpli*. The Transaction Committee's extremely narrow remit, *i.e.*, deal with Wisconsin Energy only, not other potential bidders—as well as the fact that it was formed in May of 2014,—rendered it unavoidably impotent. At the very least, shareholder are entitled to an explanation of why the Transaction Committee was not

formed earlier and whether the Board ever considered giving the Transaction Committee authority to pursue a transaction with any party other than Wisconsin Energy.

78.     Finally, the Registration Statement is completely silent as to what additional benefits the members of the Board and management will receive as a result of the consummation of the Proposed Acquisition.  For instance, aside from a statement that Mr. Schrock will "retire" after the transaction is completed, there is no discussion in the Registration Statement of whether other members of the Board or executive management, *i.e.*, those who were directly involved in the consummation of the transaction, have been offered, promised or will receive continued employment, additional stock consideration or other benefits as a following the transaction. Indeed, there is no mention of whether or not continued employment or other post-Proposed Acquisition benefits were even discussed prior to—or after—the signing of the Merger Agreement.

> **3.     Misstatements and Omissions Concerning Projections and Financial Information Considered by the Board**

79.     The Registration Statement reflects that in February, March and May of 2014— well into the negotiation of the Proposed Acquisition with Wisconsin Energy—Lazard had generated and discussed with the Board a "preliminary analysis" and "preliminary valuation" of Integrys for use in generating an estimate as to an appropriate "price and form of consideration" for the transaction.  *See* Registration Statement at 40-41, 45.  As the Registration Statement sets forth:

> On February 13, 2014, the Integrys Board held a regularly scheduled meeting at which representatives of Lazard were present. Mr. Schrock summarized his communications with Mr. Klappa since December 18, 2013. **A representative of Lazard provided an overview of Integrys' management plan and potential strategic alternatives that could complement Integrys' long-term financial and strategic plan.** A representative of Lazard reviewed selected potential strategic alternatives with potential counterparties, which included four strategic buyers, three potential merger parties and one potential strategic target. The

representative also discussed a potential take private alternative. The representative discussed with the Integrys Board Lazar's preliminary analysis of a potential transaction with each such counterparty and the industrial logic of a potential transaction. The representative of Lazard also reviewed Lazard's views on the likely strategic interest of each such counterparty of a potential M&A transaction, in general and specifically with respect to Integrys, as well as the likely ability of such counterparty to consummate a potential transaction and the perceived likelihood that any such counterparty would approach Integrys with a proposal offering better value than Wisconsin Energy's proposal. The Integrys Board discussed the likelihood of any other of the identified potential buyers making an offer for Integrys that would represent more value to Integrys' shareholders than Wisconsin Energy's proposal and discussed the strong strategic rationale of a transaction with Wisconsin Energy. After discussion, during which the Integrys Board also considered the risk of a leak if any of the potential buyers were contacted and the risk to Wisconsin Energy's proposal posed by that leak, the Integrys Board determined that it would defer a decision about whether to contact other potential counterparties until it had more clarity with respect to Wisconsin Energy's proposal.

On February 20, 2014, Mr. Schrock telephoned Mr. Klappa to request a meeting to further discuss a potential transaction. Messrs. Klappa and Schrock agreed to a meeting on Tuesday, March 4, 2014 in Milwaukee, Wisconsin.

On March 1, 2014, the Integrys Board held a special meeting at which representatives of Lazard and Foley & Lardner LLP, referred to as Foley, were present. A representative of Foley provided an overview of certain matters under Wisconsin law, including an overview of director and officer fiduciary duties and considerations in strategic transactions. Senior management reviewed Integrys' financial and strategic plan as a stand-alone entity and Wisconsin Energy's strategic plan. **A representative of Lazard discussed Lazard's preliminary analysis of Integrys' financial and strategic plan, preliminary valuation and options relating to a potential strategic transaction.** Mr. Schrock reviewed management's observations of Lazard's preliminary analysis and discussed constituent considerations, including customer, employee and regulatory concerns. The Integrys Board discussed the Integrys financial and strategic plan, potential counterparties for strategic transactions and alternatives that would be in the best interests of Integrys shareholders. At this meeting, the Integrys Board resolved to formally engage Lazard to provide advisory services to Integrys in regard to potential strategic transactions.

* * *

On May 15, 2014, the Integrys Board held a regular scheduled meeting at which representatives of Lazard, Cravath and Foley were present. A representative of Lazard reviewed Lazard's revised analysis of Integrys' management plan, Wisconsin Energy's long-term plan and Wisconsin Energy's revised non-binding

indicative offer. **A representative of Lazard reviewed Lazard's preliminary pro forma financial analysis of a combined Integrys and Wisconsin Energy company and compared the revised non-binding indicative offer with precedent transactions.** The Integrys Board discussed the request for exclusivity included in the revised non-binding indicative offer and the benefits and risks of agreeing to such request. The Integrys Board and Integrys' advisors also discussed potential alternative strategic transactions with other counterparties. A representative from Lazard discussed with the Integrys Board Lazard's analysis of other potential counterparties. The Integrys Board discussed the likelihood of any other of the identified potential buyers making an offer for Integrys that would represent more value to Integrys' shareholders than Wisconsin Energy's proposal, as well as the risk of a leak if any of the potential buyers were contacted and the rish to Wisconsin Energy's proposal posed by that leak.

Registration Statement at 40-41, 45-46 (emphasis added). While termed as 'preliminary' these projections, along with the financial analysis performed utilizing them, were integral to the Board's evaluation of a proper price for Integrys. Indeed, the 'preliminary' analysis necessarily would have been integral to the Board's analysis of the "non-binding indication of interest letter" which was received on April 23, 3014. *See* Registration Statement at 43. Moreover, it likely would have been these preliminary projections that the Board was considering when it "determined not to actively seek proposals from other potential transaction counterparties" in May of 2014. *See* Registration Statement at 46. Nonetheless, the Registration Statement fails to include either the 'preliminary' financial analysis performed by Lazard or the analysis accompanying them. A reasonable shareholder would necessarily find such information material in deciding how to vote on the Proposed Acquisition, due primarily to the fact that the Board considered such projections and analysis in considering the desirability of a transaction with Wisconsin Energy, to the exclusion of other parties.

80. Additionally, the 'final' projections included in the Registration are extremely attenuated, providing very little information to Integrys shareholders when attempting to weigh

the merits of the Proposed Acquisition. As they stand, the projections provided in the Registration Statement give shareholders insight into only three (3) line items:

*Integrys Base case*

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2014E | 2015E | 2016E | 2017E | 2018E |
| | ($ in millions) | | | | |
| EBITDA | $ 912 | $ 932 | $ 1,032 | $ 1,074 | $ 1,204 |
| Net Income | $ 435 | $ 294 | $ 328 | $ 337 | $ 386 |
| Capital Expenditures | $ 1,077 | $ 799 | $ 916 | $ 896 | $ 772 |

*Integrys Enhanced Status Quo case*

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2014E | 2015E | 2016E | 2017E | 2018E |
| | ($ in millions) | | | | |
| EBITDA | $ 912 | $ 988 | $ 1,123 | $ 1,182 | $ 1,347 |
| Net Income | 418 | 317 | 368 | 383 | 447 |
| Capital Expenditures | 1,247 | 875 | 1,033 | 1,015 | 837 |

*Integrys Downside case*

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2014E | 2015E | 2016E | 2017E | 2018E |
| | ($ in millions) | | | | |
| EBITDA | $ 904 | $ 911 | $ 994 | $ 1,029 | $ 1,120 |
| Net Income | 409 | 282 | 306 | 312 | 347 |
| Capital Expenditures | 1,057 | 773 | 783 | 676 | 777 |

Registration Statement at 63. This is simply not enough information for shareholders to either: (1) make an informed decision on the financial prospects of Integrys in relation to the compensation being offered by Wisconsin Energy; or (2) recreate the financial analysis performed by Lazard's fairness opinion which is included in the Registration Statement.

81. Among other things, the projections at page 63 of the Registration Statement fail to disclose the following line items necessary to make sense of the numbers that are presented, such as:

- Revenues;

- Earnings Before Interest and Taxes ("EBIT");

- Unlevered free cash flow;

- Changes in net working capital;

- Taxes/deferred taxes;

- Net debt;

- Dividends;

- Preferred interest;

- Minority interest;

- Stock-based compensation expense; and

- Any other adjustments to unlevered free cash flows.

82.     Also included in the Registration Statement are certain projections for Wisconsin Electric.  However, like the projections given for Integrys, the Wisconsin Electric projections provide only three isolated data points, insufficient for shareholders to intelligently analyze the Proposed Acquisition from a financial perspective:

*Wisconsin Energy Management Case*

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2014E** | **2015E** | **2016E** | **2017E** | **2018E** |
| | | | ($ in millions) | | |
| EBITDA(1) | $        1,553 | $        1,548 | $        1,693 | $        1,761 | $        1,799 |
| Net Income | $           596 | $           611 | $           648 | $           675 | $           691 |
| Capital Expenditures | $           711 | $        1,094 | $           662 | $           664 | $           671 |

(1)     Non-GAAP measure. For this purpose, EBITDA represents net income before interest, tax, depreciation, and amortization.

*Wisconsin Energy Adjusted Management Case*

| | 2014E | 2015E | 2016E | 2017E | 2018E |
|---|---|---|---|---|---|

|  | | | | | ($ in millions) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| EBITDA(2) | $ | 1,677 | $ | 1,642 | $ | 1,795 | $ | 1,891 | $ | 1,936 |
| Net Income | $ | 597 | $ | 581 | $ | 621 | $ | 647 | $ | 665 |
| Capital Expenditures | $ | 711 | $ | 1,094 | $ | 662 | $ | 664 | $ | 671 |

Registration Statement at 62.

83.    As with the Integrys projections, the Wisconsin Electric projections provided in the Registration Statement are incomplete.  A number of other metrics are necessary in order for shareholders to fully understand and scrutinize the Proposed Acquisition, including:

- Revenue;

- Earnings Before Interest and Taxes ("EBIT");

- EBITDA;

- Taxes;

- Capital expenditures;

- Changes in net working capital; and

- Unlevered free cash flow.

84.    Similarly, synergies are an important metric when evaluating any strategic transaction.  Synergies represent the potential for savings related to expenses (or costs) and increased revenues resulting from efficiencies gained by the combination of enterprises which operate in the same or overlapping market sectors, commonly referred to as either cost or revenue synergies.  The Registration Statement makes only passing references to the synergies which the Board considered in conjunction with the Proposed Acquisition by Wisconsin Electric. For example, the Registration statement states that, in conjunction with the fairness opinion that it prepared for the Board; Lazard consulted with management and utilized a synergies estimate of "$101 million achieved in the third year following the transaction, with $32 million of synergies

achieved in the first year and $66 million in the second year." Registration Statement at 86. Curiously, however, these numbers were only utilized in Lazard's "Pro Forma Total Shareholder Return Analysis," and apparently not the other analysis that Lazard performed. *See id*. Also, it is clear that the Board considered estimates of synergies when approving the Proposed Acquisition, as the ability of the post-Proposed Acquisition entity to achieve those synergies is listed as part of the "Risks and Factors Weighing Against the Merger" that the Board "identified" in its deliberations. *See* Registration Statement at 59 ("The Integrys Board also identified and considered the potential adverse impact of other factors weighing negatively against the merger, including, but not limited to, the following: . . . the fact that forecasts of future results of operations and cost and growth synergies are necessarily estimates based on assumptions, and that for these and other reasons there is a risk of not capturing all the anticipated synergies and cost savings between Integrys and Wisconsin Energy and the risk that other anticipated benefits may not be realized.").

85.     Nonetheless, the Registration Statement fails to give shareholders any detail or insight whatsoever which might be used to evaluate the probability that the combined company will achieve the synergies. The Registration Statement fails to inform shareholders of how reliable or likely the Board considered the numbers for synergies utilized by Lazard to be, leaving shareholders to wonder whether the synergies numbers are just a guess or something more analytical. Relatedly, shareholders are left wondering as to the components of the synergies, as the Registration statement fails to even break down the synergies estimate into cost versus revenue synergies, much less informing shareholders of what specific business segments, subsidiaries or service categories would benefit from increased efficiency. Shareholders are instead left to wonder as to the importance that the synergies estimate—an extremely important

metric in such a transaction—should have in their deliberations as to the merits of the Proposed Acquisition.

### 4. Misstatement and Omissions Concerning the Sale of IES and Impact on Projections

86.     One of the major topics of discussion during the lead-up to the Proposed Acquisition seemed to be the disposition of IES subsidiaries, chief of which is Integrys Energy Services ("IES").  IES was formed to market electricity and natural gas in the retail market, unlike the other regulated portions of Integrys' business.  The margins from IES was far less than those generated by Integrys' regulated business, therefore the disposition of IES would make the Company a far better merger candidate.  As such, it is unsurprising that—as early as April of 2014—Wisconsin Energy and Integrys discussed IES the divestiture of IES during the lead up to the consummation of the merger agreement:

> On April 7, 2014, members of senior management of Wisconsin Energy and Integrys, together with their respective financial advisors, met to discuss Integrys' non-regulated businesses and its plan to divest. The discussion related to Integrys Energy Services, Inc., a subsidiary of Integrys referred to as IES, and its business segments involved in marketing electricity and natural gas in various retail markets, referred to as the IES Retail Business, and investing in energy assets with renewable attributes, referred to as the IES Solar Business, as well as to Integrys' compressed natural gas business.

Registration Statement at 42-43.

87.     On a number of subsequent occasions the Integrys Board, with and without the input of Wisconsin Electric discussed the fate of IES, focusing on the value of IES and the financial profile of Integrys following a potential sale or divestiture of IES:

> On June 9, 2014, representatives of Barclays and representatives of **Lazard had a discussion regarding the structure of the consideration to be paid to Integrys shareholders, including the contingent consideration component relating to the sale of the IES Retail Business**.

* * *

On June 10, 2014, the Integrys Board held a special telephonic meeting at which representatives of Lazard and Cravath were present. Mr. Schrock reviewed the status of discussions with Wisconsin Energy, including open issues in the merger agreement negotiations and due diligence discussions. Senior management reviewed the potential sale of the IES Retail Business. Following discussion, the Integrys Board determined to communicate to Wisconsin Energy that the terms of the revised non-binding indicative offer did not represent sufficient value to Integrys' shareholders especially in light of the contingent consideration component of the offer.

\* \* \*

On June 14, 2014, Mr. Lawrence T. Borgard, President and Chief Operating Officer of Integrys, called Mr. Leverett to discuss the status of Integrys' efforts to sell the IES Retail Business. The next day, Integrys provided Wisconsin Energy with a redacted copy of the agreement pursuant to which Integrys was considering selling the IES Retail Business.

\* \* \*

On June 16, 2014, the Integrys Board held a special telephonic meeting at which representatives of Lazard, Cravath and Foley were present. Mr. Schrock informed the Integrys Board that Wisconsin Energy had submitted a revised proposal earlier that day and reviewed the terms of the proposal. The proposal, which was based on closing prices on June 13, 2014, included total consideration value of $69.27 per share of Integrys common stock, consisting of $18.43 in cash and 1.128 shares of Wisconsin Energy common stock per share of Integrys common stock. Mr. Schrock added that the revised proposal did not include any contingent consideration mechanism related to the potential sale of the IES Retail Business. Integrys senior management then reviewed the potential sale of the IES Retail Business and the status of the due diligence process with Wisconsin Energy. A representative of Lazard reviewed Lazard's preliminary financial analysis of the revised proposal. Mr. Schrock then discussed the status of the merger agreement negotiations, including outstanding issues on the merger agreement. After discussion, the Integrys Board directed management to ask Wisconsin Energy to submit an updated proposal that would provide additional value for Integrys' shareholders.

\* \* \*

On June 17, 2014, Mr. Schrock telephoned Mr. Klappa to provide him with a summary of the meeting of the Integrys Board held on June 16, 2014. Mr. Schrock notified Mr. Klappa that the Integrys directors had considered and discussed various matters relating to the proposed transaction, including valuation of Integrys, the proposed termination fee, the treatment of equity awards, the ongoing commitment to community of the combined company, the number of

Integrys directors to be appointed to the board of the combined company, the size of the retention pool and the status of the sale of the IES Retail Business. Mr. Schrock informed Mr. Klappa that it was important that Integrys be permitted to select the Integrys directors to be appointed to the combined company board, but there was no discussion on which Integrys directors would be so appointed.

* * *

On June 18, 2014, Messrs. Klappa and Schrock spoke again via telephone. Messrs. Klappa and Schrock discussed several key transaction issues relating to valuation of Integrys, the amount of a proposed termination fee, the treatment of equity awards, the number of Integrys directors to be appointed to the board of the combined company, the size of the retention pool and the sale of the IES Retail Business.

* * *

On June 18, 2014, the Integrys Board held a special meeting for purposes of considering the proposed transaction with Wisconsin Energy. Members of senior management of Integrys and representatives of Lazard, Cravath and Foley were present at the meeting. Mr. Schrock discussed the potential sale of the IES Retail Business. The Integrys Board resolved to authorize the officers of Integrys to negotiate and approve the proposed sale of the IES Retail Business. Representatives of Cravath and Foley reviewed the Integrys Board's fiduciary duties.

Registration Statement at 46-49 (emphasis added). As the disclosures above make clear, the sale of IES was an extremely important consideration to both Integrys, and perhaps more so to Wisconsin Energy, during the planning of the Proposed Acquisition. In fact, it is clear that a sale of IES was important enough an issue for Wisconsin Electric to threaten to make the consideration contingent upon a sale or divestiture. As such, information concerning the impact of a sale or the lack of a sale of IES is necessarily information which would be material to the Proposed Acquisition and, therefore, shareholders' consideration of the Proposed Acquisition.

88.     However, the Registration Statement fails to provide any discussion of the value that the IES Board place on IES in June of 2014. Similarly missing from the Registration Statement is any discussion or disclosure of the financial analysis (or analyses) reflecting the

valuation estimates that the Integrys Board reviewed in determining that selling the IES business would be beneficial in conjunction with the proposed sale of the remainder of Integrys to Wisconsin Energy. Given the apparent make-or-break-it importance placed on the fate of IES, shareholders are entitled to understand the Board's rationale for selling IES and the impact that a sale of IES—standing apart from the Proposed Acquisition—would have had on Integrys going forward.

89.     As it turns out, IES was sold. As the Registration Statement sets forth, Integrys agreed to sell IES on July 30, 2014, just after the announcement of the Proposed Acquisition:

> On July 30, 2014, Integrys' management announced that they entered into a definitive agreement to sell the retail energy business of Integrys Energy Services (IES) to a third party. The purchase price is $60 million plus an amount for adjusted working capital at the time of closing. As of May 31, 2014, IES had adjusted working capital of approximately $183 million. The IES retail energy business consists of mostly financial assets and liabilities and does not qualify as an asset held for sale under the applicable accounting guidance.

Registration Statement at 162.

90.     The sale of IES, a subsidiary responsible for approximately $2,000,000 in revenues in 2013, fundamentally changes the investment character of Integrys from a financial standpoint. However, the Registration Statement fails to state whether the summary projections that are provided in the Registration Statement, *see supra*, include or do not include IES as a basis for those numbers. Moreover, due to the summary nature of the projections, it is impossible for IES shareholders to determine whether IES is included, or not included, in those projections. Accordingly, the projections are materially misstated, as any shareholder would want to know whether the sale of the Company's largest subsidiary business is affecting the projections that form a large basis for the Board's Recommendation of the Proposed Acquisition.

91. To compound matters, the Registration Statement sets forth pro forma financial information for the combined post-Proposed Acquisition entity, incorporating both Integrys and Wisconsin Energy's numbers. However, the pro forma financial presentation in the Registration Statement only tells part of the story—what the combined company would look like with IES, even though the sale of IES had been agreed to at the time of the Registration Statement:

**WEC ENERGY GROUP, INC.**
**UNAUDITED PRO FORMA CONDENSED COMBINED**
**CONSOLIDATED STATEMENTS OF INCOME**
**For the Six Months Ended June 30, 2014**

| | Wisconsin Energy | Integrys | Pro Forma Adjustments | Note 3 | Pro Forma Combined |
|---|---|---|---|---|---|
| | (Millions of Dollars, Except Per Share Amounts) | | | | |
| Revenues | | | | | |
| Utility revenues | $ 2,711.9 | $ 2,422.8 | $ — | | $ 5,134.7 |
| Nonregulated revenues | 26.8 | 1,934.7 | — | | 1,961.5 |
| Total Operating Revenues | 2,738.7 | 4,357.5 | — | | 7,096.2 |
| | | | | | |
| Operating Expenses | | | | | |
| Utility cost of fuel, purchased power and natural gas | 1,328.5 | 1,343.2 | — | | 2,671.7 |
| Nonregulated cost of sales | — | 1,824.0 | — | | 1,824.0 |
| Other operation and maintenance | 531.4 | 738.2 | (11.0) | (b) | 1,258.6 |
| Depreciation and amortization | 202.0 | 144.2 | — | | 346.2 |
| Property and revenue taxes | 60.9 | 28.6 | — | | 89.5 |
| Total Operating Expenses | 2,122.8 | 4,078.2 | (11.0) | | 6,190.0 |
| Treasury Grant | 6.6 | — | — | | 6.6 |
| Operating Income | 622.5 | 279.3 | 11.0 | | 912.8 |
| Earnings from equity method investments | 34.8 | 46.8 | — | | 81.6 |
| Other Income, net | 9.2 | 11.1 | — | | 20.3 |
| Interest Expense, net | 121.3 | 79.4 | 22.9 | (c) | 223.6 |
| Income from Continuing Operations Before Income Taxes | 545.2 | 257.8 | (11.9) | | 791.1 |
| Income Tax Expense | 204.6 | 98.0 | (4.8) | (d) | 297.8 |
| Net Income From Continuing Operations | $ 340.6 | $ 159.8 | $ (7.1) | | $ 493.3 |
| | | | | | |
| Earnings Per Share | | | | | |
| Basic | $ 1.51 | $ 1.99 | | | $ 1.56 |
| Diluted | $ 1.50 | $ 1.98 | | | $ 1.55 |
| | | | | | |
| Weighted Average Common Shares Outstanding (millions) | | | | | |
| Basic | 225.6 | 80.2 | 9.5 | (e) | 315.3 |
| Diluted | 227.7 | 80.5 | 9.2 | (e) | 317.4 |

Registration Statement at 154. It should be noted that, unlike the projections of Integrys' future financial performance discussed above, it is obvious that IES is included in the pro forma income

statement—because the pro forma numbers included $1.935 billion in "Nonregulated revenues," which could only reasonably be attributable to IES. Indeed, had the projections discussed above included revenue numbers, shareholders would have been able to determine whether the IES numbers had been included in the Registration Statement.

92.     Nonetheless, both the projections at page 63 of the Registration Statement and the pro forma financials at pages 154-156 are materially misstated.  Given the importance of the sale of IES to both Wisconsin Energy and the post-Proposed Acquisition entity, shareholders have the right to all material information, **including the right to financial projections and pro forma financials both: (a) assuming the sale of IES; and (b) assuming that IES was not sold.**   The failure of Defendants to provide shareholders with information concerning wither IES was factored into projections and pro forma financials which served as a basis for the Board recommending that shareholders vote in favor of the Proposed Acquisition represents a stand-alone violation of Sections 14(a) and 20(a) of the Exchange Act.

### 5.     Misstatement and Omissions Concerning the Lack of Protection for Integrys Shareholders

93.     The Proposed Acquisition is composed of both a stock and a cash component. The cash component of the Proposed Acquisition is fixed.  However, the stock portion of the consideration is not.  In other words, under the terms of the Merger Agreement, should the value of Wisconsin Energy stock fall between the time of the approval of the Proposed Acquisition and the time that the transaction is consummated, Integrys shareholders will receive far less than was 17% trumpeted by Integrys at the announcement of the deal.  Indeed, if the Proposed Acquisition would have been consummated on August 20, 2014, the equivalent price paid to Integrys shareholders would have been approximately $68.34, just a 1.81% premium to Integrys' closing share price on that date:

| Date | WE Share Price | Acquisition Equiv. Share Price | TEG Share Price | Implied Premium |
|---|---|---|---|---|
| 20-Aug-14 | 44.11 | 68.34 | 67.10 | 1.81% |
| 19-Aug-14 | 44.21 | 68.45 | 67.02 | 2.09% |
| 18-Aug-14 | 43.28 | 67.40 | 65.97 | 2.12% |
| 15-Aug-14 | 43.47 | 67.61 | 66.30 | 1.94% |
| 14-Aug-14 | 43.39 | 67.52 | 66.38 | 1.69% |
| 13-Aug-14 | 43.19 | 67.30 | 65.98 | 1.96% |
| 12-Aug-14 | 42.86 | 66.93 | 65.21 | 2.56% |
| 11-Aug-14 | 42.85 | 66.91 | 65.58 | 1.99% |
| 8-Aug-14 | 43.02 | 67.11 | 65.57 | 2.29% |
| 7-Aug-14 | 42.27 | 66.26 | 64.40 | 2.81% |
| 6-Aug-14 | 41.66 | 65.57 | 63.79 | 2.72% |
| 5-Aug-14 | 42.48 | 66.50 | 64.59 | 2.87% |
| 4-Aug-14 | 43.17 | 67.28 | 65.19 | 3.10% |
| 1-Aug-14 | 43.61 | 67.77 | 66.14 | 2.41% |
| 31-Jul-14 | 43.19 | 67.30 | 65.56 | 2.58% |
| 30-Jul-14 | 44.02 | 68.23 | 67.54 | 1.02% |
| 29-Jul-14 | 44.93 | 69.26 | 69.03 | 0.33% |
| 28-Jul-14 | 45.67 | 70.10 | 69.98 | 0.17% |
| 25-Jul-14 | 44.74 | 69.05 | 68.85 | 0.28% |
| 24-Jul-14 | 45.18 | 69.54 | 69.49 | 0.08% |
| 23-Jul-14 | 45.07 | 69.42 | 69.17 | 0.36% |
| 22-Jul-14 | 44.95 | 69.28 | 69.07 | 0.31% |
| 21-Jul-14 | 44.91 | 69.24 | 69.07 | 0.24% |
| 18-Jul-14 | 44.97 | 69.31 | 69.14 | 0.24% |
| 17-Jul-14 | 44.46 | 68.73 | 68.58 | 0.22% |
| 16-Jul-14 | 44.75 | 69.06 | 69.14 | -0.12% |
| 15-Jul-14 | 44.56 | 68.84 | 68.89 | -0.07% |
| 14-Jul-14 | 44.40 | 68.66 | 68.70 | -0.05% |
| 11-Jul-14 | 44.81 | 69.13 | 69.23 | -0.15% |
| 10-Jul-14 | 45.20 | 69.57 | 69.74 | -0.25% |
| 9-Jul-14 | 44.81 | 69.13 | 69.28 | -0.22% |
| 8-Jul-14 | 44.99 | 69.33 | 69.56 | -0.33% |
| 7-Jul-14 | 44.79 | 69.10 | 68.96 | 0.21% |
| 3-Jul-14 | 44.50 | 68.78 | 68.50 | 0.40% |
| 2-Jul-14 | 44.93 | 69.26 | 69.10 | 0.23% |
| 1-Jul-14 | 46.06 | 70.54 | 70.33 | 0.29% |
| 30-Jun-14 | 46.50 | 71.03 | 71.13 | -0.14% |
| 27-Jun-14 | 46.37 | 70.89 | 70.92 | -0.05% |

| 26-Jun-14 | 46.23 | 70.73 | 70.23 | 0.70% |
| 25-Jun-14 | 45.71 | 70.14 | 69.33 | 1.16% |
| 24-Jun-14 | 45.62 | 70.04 | 69.27 | 1.10% |
| 23-Jun-14 | 44.86 | 69.18 | 68.35 | 1.20% |
| 20-Jun-14 | 46.47 | 71.00 | 60.95 | 14.15% |

In addition, as the table above reflects, there are a number of trading days where the premium paid to Integrys shareholders would have been 0 or negative.

94.     The situation would be made worse if Wisconsin Energy stock—for any reason whatsoever—were to fall even lower.  For instance, assuming the price of Integrys stock on August 20, 2014 ($67.10), if Wisconsin Energy stock were $35.00 per share, shareholders would hypothetically receive only $58.06 for each share of their Integrys stock, at a -15% 'premium'.

95.     The Integrys Board could have easily solved this problem and protected the Company's shareholders from a potential steep decline in Wisconsin Energy's stock—the employment of what is known as a "collar."  The Registration Statement is essentially silent as to the use of a collar, except to state that one is not provided for in the Merger Agreement.  As the Registration Statement states, one of the "Risks and Factors Weighing Against the Merger" is the fact that the Board failed to procure a collar for shareholders:

> . . . because the stock portion of the merger consideration is a fixed number of shares of Wisconsin Energy common stock, Integrys shareholders could be adversely affected by a decrease in the trading price of Wisconsin Energy common stock following the announcement of the merger, and the merger agreement does not provide Integrys with a price-based termination right or other similar protection for Integrys or its shareholders, such as a "collar" with respect to Wisconsin Energy's stock price. . .

Registration Statement at 59.

96.     What is missing from the Registration Statement is any indication of whether the Integrys Board even discussed the possibility of some sort of protective collar that would have protected shareholders.  The mention of the concept of a collar in the Registration Statement

suggests that such an idea was considered (because it is listed as a risk that the Board "identified"), but the Registration Statement does not provide shareholders with any explanation why a collar was not requested, nay demanded, from Wisconsin Energy. If a collar was not requested as part of the negotiations of the Proposed Acquisition, shareholders have a right to understand the reasons why the Board considered a collar unnecessary or undesirable as a prophylactic protection for shareholders. Further, if a collar was requested by the Integrys Board, but denied by Wisconsin Electric, shareholders have a right to understand why the Board thought that a collar was unimportant or what concessions were granted to Integrys in lieu of a collar. Given the very small potential 'premium' in this case, the Board's decision to sign a merger agreement with **no protection whatsoever for shareholders**, requires at least a cursory explanation.

97. In addition, while the Registration Statement suggests that Integrys was allowed the opportunity to conduct "mutual due diligence" with regard to Wisconsin Energy's business, there is no indication of the nature or depth of the due diligence that took place. For instance, almost all of the discussions of due diligence leading up to the Proposed Acquisition involves due diligence concerning Integrys' businesses, not that of Wisconsin Energy. *See, e.g.*, Registration Statement at 46 ("On June 3, 2014, the Integrys Board held a special telephonic meeting at which representatives of Lazard and Cravath were present. Mr. Schrock reviewed the status of discussions with Wisconsin Energy, including discussions regarding due diligence matters, Wisconsin Energy's analysis of federal regulatory matters and the third-party credit assessment of the potential transaction."). Given the vital importance of the stock component of the Proposed Acquisition to Integrys shareholders, the extent to which Integrys conducted due diligence into Wisconsin Energy's business prospects—aside from merely looking at certain

limited projections, which the Registration Statement stated took place, see Registration Statement at 61-62—is of vital importance in considering whether to vote in favor of the Proposed Acquisition.

> **6.** **Misstatements and Omissions Concerning the Necessity for Defensive Measures and Lack of Price Protection for Integrys Shareholders**

98.     As part of the Proposed Acquisition, the Integrys Board instituted—and left in place—a number of measures intended to protect the transaction with Wisconsin Energy and defend it from any third-party bidder that may emerge.  These include: (1) a strict no-solicitation clause which prevents Integrys, its Board or employees from soliciting any third-party offer; (2) a matching rights provision which provides Wisconsin Energy with the right to match any, unlikely, unsolicited offer; (3) a $175 million termination fee, payable in the event that the Proposed Acquisition is not consummated; and (4) provisions of Wisconsin law foreclosing the possibility of a hostile offer for Integrys, which the Company has failed to opt out of.

99.     As the Registration Statement sets forth, such a non-solicitation clause represents an onerous preclusion to any party that may be included to otherwise attempt to bid against Wisconsin Energy for Integrys:

> Under the merger agreement, Wisconsin Energy and Integrys are restricted, subject to limited exceptions, from pursuing or entering into alternative transactions in lieu of the merger. In general, unless and until the merger agreement is terminated, both Wisconsin Energy and Integrys are restricted from, among other things, soliciting, initiating, knowingly encouraging, inducing or knowingly facilitating a competing acquisition proposal from any person. Each of the Wisconsin Energy Board and the Integrys Board is limited in its ability to change its recommendation with respect to the merger-related proposals. Wisconsin Energy or Integrys may terminate the merger agreement and enter into an agreement with respect to a superior offer only if specified conditions have been satisfied, including compliance with the non-solicitation provisions of the merger agreement, the expiration of certain waiting periods during which the other party may propose changes to the merger agreement so the superior offer is no longer a superior offer and the payment of the required termination fee. These provisions could discourage a third party that may have an interest in acquiring all or a significant part of Wisconsin Energy or Integrys from considering or

proposing such an acquisition, even if such third party were prepared to pay consideration with a higher per share cash or market value than the consideration proposed to be received or realized in the merger, or might result in a potential acquirer proposing to pay a lower price than it would otherwise have proposed to pay because of the added expense of the termination fee that may become payable. As a result of these restrictions, neither Wisconsin Energy nor Integrys may be able to enter into an agreement with respect to a more favorable alternative transaction without incurring potentially significant liability to the other.

Registration Statement at 32.

100. The Registration Statement also describes the termination fee and matching rights provision, which, working together render any unsolicited third-party offer an economic and practical impracticality:

[B]efore the Wisconsin Energy stockholder approval is obtained, in the case of the Wisconsin Energy Board, or the Integrys shareholder approval is obtained, in the case of the Integrys Board, the Wisconsin Energy Board or the Integrys Board, as the case may be, may terminate the merger agreement, which termination right we refer to as the pre-shareholder approval takeover termination right, under the following circumstances:

• if substantially concurrently with such termination, the subject company enters into an acquisition agreement with respect to a superior proposal;

• concurrently with such termination, the terminating company pays the other party a termination fee of $175 million;

• the subject board provides prior written notice to the other party that it is prepared to terminate the merger agreement in response to a superior proposal, which notice will attach the most current draft of any written agreement relating to the transaction that constitutes such superior proposal;

• the other party does not, within four business days after the receipt of such notice (it being understood and agreed that any amendment to the financial terms or any other material term of a superior proposal will require a new notice and four business day period), propose changes to the merger agreement that would, in the reasonable good faith judgment of the subject board (after consultation with a financial advisor of nationally recognized reputation and outside legal counsel), cause the offer previously constituting a superior proposal to no longer constitute a superior proposal; and

• at the end of such four business day period and taking into account any changes to the terms of the merger agreement proposed by the other party, the subject board determines in good faith (after consultation with a financial advisor of nationally recognized reputation and outside legal counsel) that the failure to terminate the merger agreement under the pre-shareholder approval takeover termination right as a result of the superior proposal would be inconsistent with its fiduciary duties under applicable law.

Each of Wisconsin Energy and Integrys agrees that, during the four business day period prior to terminating the merger agreement pursuant to the conditions described above, if requested by the other party, the subject company and its representatives will negotiate in good faith with the other party and its representatives regarding any revisions to the terms of the transaction contemplated by the merger agreement proposed by the other party. In determining whether to terminate the merger agreement under the pre-shareholder approval takeover termination right, the subject board will take into account all written or oral information, opinions or analyses submitted by or on behalf of the other party, and any changes to the terms of the merger agreement proposed by the other party in response to a notice of such termination.

Registration Statement at 125-126.

101.    Finally, the Registration Statement identifies the provisions of Wisconsin law which would severely restrict the ability of an interested part to launch a hostile takeover of Integrys.  As the Registration Statement Provides:

*Control Share Acquisitions*

Wisconsin law provides that, unless a corporation's articles of incorporation provide otherwise, the voting power of shares of a "resident domestic corporation" such as Wisconsin Energy or Integrys held by any person (including two or more persons acting as a group) in excess of 20 percent of the voting power in the election of directors is limited (in voting on any matter) to 10 percent of the full voting power of those shares. This restriction does not apply to shares acquired directly from the resident domestic corporation, or in certain specified transactions, or incident to a transaction in which the corporation's shareholders have approved restoration of the full voting power of the otherwise restricted shares.

Under its charter, Wisconsin Energy has opted out of this control share acquisition restriction. **Integrys has not opted out of such restriction.**

* * *

*Fair Price Provisions*

Wisconsin law provides that in addition to any approval otherwise required, certain mergers, share exchanges or sales, leases, exchanges or other dispositions involving a resident domestic corporation, such as Integrys or Wisconsin Energy, and any significant shareholder are subject to a super-majority vote of shareholders unless certain fair price standards have been met. For this purpose a significant shareholder is defined as either a 10 percent shareholder or an affiliate of the resident domestic corporation who was a 10 percent shareholder at any time within the preceding two years. The super-majority vote that is required by the statute consists of:

• approval of 80 percent of the total voting power of the corporation, and
• approval of at least $66^2/_3$ percent of the voting power not beneficially owned by the significant shareholder or its affiliates or associates.

However, a supermajority vote is not required if the following "fair price" standards are satisfied:

• the consideration is in cash or in the form of consideration used to acquire the greatest number of shares, and
   • the amount of the consideration equals the greater of:

      a) the highest price paid by the significant shareholder within the prior two-year period;
   b) in the case of a tender offer, the market value of the shares on the date the significant shareholder commences the tender offer; or
   c) the highest liquidation or dissolution distribution to which the shareholders would be entitled.

**Neither Wisconsin Energy nor Integrys has opted out of the restrictions above.** The Wisconsin Energy charter further requires an affirmative vote by 80 percent of the aggregate number of votes that holders of Wisconsin Energy common stock and preferred stock are entitled to cast on a charter amendment (and the same percentage of any separate class vote of holders of shares of such a class or series so entitled to vote under the Wisconsin Energy charter or Wisconsin law as a class) if that amendment would have the effect of opting out of the fair price provisions.

Registration Statement at 167-168 (emphasis added).

102.    What is missing from the Registration Statement is any rationale, explanation or information concerning why the Integrys Board decided that such a preclusive cadre of defensive measures were needed to protect a transaction that faced no market check, no sales process, no

bidding process, no solicitation of any third-party offers in the first instance. If, as the Integrys'

Board's recommendation to shareholders is correct and valid, the Proposed Acquisition is fair to

the Company's shareholder, it does not make sense that the Board would allow such pernicious

defensive provisions to be included as part of the Merger Agreement. Indeed, if the Proposed

Acquisition is fair, the Integrys Board should have been insistent that some third-party proof of

the fairness of the transaction be provided to shareholders—such as allowing the Board and

management to solicit third-party offers, allowing superior proposals to be approved without a

$175 million termination fee and, at base, allowing the market to assess and validate the fairness

and desirability of the Proposed Acquisition to Integrys shareholders. This could have been

easily done by allowing for a "marketing" or "go-shop" period, in which other potential

interested bidders could engage the Company under no restrictions whatsoever for a period of

time. The failure of the Registration Statement to give any explanation whatsoever for the need

for defensive measures in conjunction with a Proposed Acquisition that was untested by any

market forces at all represents a material omission in violation of the securities laws.

103.    Similarly, the Registration Statement is void of any analysis of what probability

or potential costs that a prolonged or unsuccessful regulatory process would have on Integrys.

The Registration Statement does acknowledge that there is a significant risk that, if regulatory

approvals are not forthcoming or if divestiture of assets is required, that would have a "potential

adverse impact" on Integrys. *See, e.g.*, Registration Statement at 59 ("The Integrys Board also

identified and considered the potential adverse impact of other factors weighing negatively

against the merger, including, but not limited to, the following: . . . the possibility that the

consummation of the merger may be delayed or not occur at all in the event of a failure of certain

closing conditions, including in particular, (i) the approval by Wisconsin Energy's stockholders

of the Share Issuance proposal, (ii) regulatory clearances and (iii) that regulatory approvals might impose conditions which could adversely affect the operations and value of the combined company, and the adverse impact that such event would have on Integrys and its business."). However, the Registration Statement does not even attempt to quantify such risks, although the Board necessarily considered such possibilities when considering the merits of the Proposed Acquisition.

**B.**    **Material Misstatement and Omissions Concerning the Fairness Opinion**

104.    As detailed herein, in eliciting support for the Proposed Acquisition, the Board failed to disclose all material information necessary to enable Integrys' shareholders to make an informed decision concerning how to vote on the Proposed Acquisition

105.    In particular, the Registration Statement fails to disclose material information concerning the financial analyses of Lazard, Integrys' financial advisor and Barclays Capital Inc. ("Barclays"), Wisconsin Energy's financial advisor, that the shareholders would find important in deciding how to vote on the Proposed Transaction.

106.    Among other things, the Barclay's fairness opinion omits or misstates the following material information concerning the fairness of the Proposed Acquisition to Wisconsin Electric's shareholders:

Information concerning *Selected Companies Analysis, see* Registration Statement at 66-68.
- The following 2014 and 2015 multiples for each of the selected comparable companies analyzed by Barclays:
    a.  P/ E
    b.  EBITDA
- Whether any type of benchmarking analyses were performed for Integrys and Wisconsin Energy in relation to the selected comparable companies.
- The separate equity value per share ranges of Integrys and Wisconsin Energy for the 2014 and 2015 P/ E and EBITDA multiples selected as part of the analysis.

Information concerning the *Selected Precedent Transactions Analysis, see* Registration Statement at 68 – 69.

- Whether any type of benchmarking analyses were for Integrys and Wisconsin Energy in relation to the target companies?
- How, if at all, the values of the investments relating to American Transmission Company included in the analysis were derived.
- The separate equity value per share ranges of Integrys and Wisconsin Energy for the FY+1 EBITDA and P/E multiples selected by Barclays.

Information concerning the *Discounted Cash Flow Analysis, see* Registration Statement at 69 – 70.

- The individual inputs and assumptions utilized to derive the discount rate ranges of 4.78% - 5.78% and 5.82 - 6.82% for Wisconsin Energy and Integrys respectively.
- The manner in which stock-based compensation expense were treated in the analysis (i.e. as a cash or a non-cash expense)?
- The implied perpetuity growth rate ranges resulting from this analysis.
- Whether the average terminal value was discounted using the weighted average cost of capital ("WACC") or cost of equity.

Information concerning the *Contribution Analysis, see* Registration Statement at 70.

- The 2015 – 2018 percentage contributions from Integrys and Wisconsin Energy for leverage adjusted EBITDA, net income and cash flow from operations.

Information Concerning the *Pro Forma Accretion/Dilution Analysis, see* Registration Statement at 71.

- The amounts of accretion expected for Wisconsin Energy's 2015 – 2018 EPS and dividends per share.

107.    Among other things, the Lazard fairness opinion omits or misstates the following

material information concerning the fairness of the Proposed Acquisition to Integrys'

shareholders:

Information concerning the *Selected Comparable Company Multiples Analysis,* Registration Statement at 76-78.

- The following 2014 and 2015 metrics and multiples for each of the selected comparable companies analyzed:
  a. P/E
  b. EBITDA
  c. Total return (or dividend yield and long-term growth rate)
- Whether any type of benchmarking analyses was performed for either Integrys or Wisconsin Energy in relation to the selected comparable companies.

Information concerning the *Consolidated Discounted Cash Flow Analysis, see* Registration Statement at 78 – 79.

- The definition of "unlevered free cash flow" utilized in the analysis?
- The individual inputs and assumptions utilized by Lazard to derive the discount rate range of 5.25% - 5.75%.
- The implied perpetuity growth rate ranges resulting from this analysis?
- How stock-based compensation expense was treated in the analysis, *i.e.*, as a cash or non-cash expense.
- The separate equity per share value ranges for Integrys and Wisconsin Energy based on the different terminal methods utilized by Lazard.

Information concerning the *Sum-of-the-Parts Discounted Cash Flow Analysis, see* Registration Statement at 79 – 81.

- The fiscal year to which the selected terminal multiples were applied in the analysis.
- The inputs and assumptions used by management to determine the selected equity values for the sale of UPPCO, Integrys Energy Services and Integrys Transportation Fuels businesses.

Information concerning the *Sum-of-the-Parts Public Market Valuation Analysis*, *see* Registration Statement at 79-81

- The reason for Lazard's performance of the analysis for Wisconsin Electric, but not for Integrys.

Information concerning the *Selected Precedent Transactions Multiples Analysis, see* Registration Statement at 82 – 83.

- The following FY +1 and FY+2 multiples for each of the target companies analyzed by Lazard:
  - a. P/E
  - b. EBITDA
- Whether any type of benchmarking analyses was performed for Integrys in relation to the target companies.
- The separate equity value per share ranges based on the P/E and EBITDA multiples selected by Lazard.

Information concerning the *Downside Case and Enhanced Status Quo Case Consolidated Discounted Cash Flow Analysis, see* Registration Statement at 85.

- The implied perpetuity growth rate ranges of both cases, resulting from the analysis.
- The separate equity per share value ranges under both cases, based on the different terminal methods utilized.

Information concerning the *Downside Case and Enhanced Status Quo Case Sum-of-the-Parts Discounted Cash Flow Analysis, see* Registration Statement at 85.

- The implied perpetuity growth rate ranges of both cases, resulting from the analysis.
- The separate equity per share value ranges under both cases, based on the different terminal methods utilized.

Information concerning the *Pro Forma Total Shareholder Return Analysis, see* Registration Statement at 86.

- The amounts of accretion expected for Integrys' shareholders for the years 2014 – 2018.

108.    Without the foregoing information, Integrys' shareholders will be unable to assess the merits of the Proposed Acquisition, including the adequacy of the consideration to be received in conjunction with transaction.  Plaintiffs seek equitable relief to prevent the irreparable injury that Company stockholders will suffer absent judicial intervention.

## COUNT I

**Violations of Section 14(a) of the Exchange Act and
SEC Rule 14a-9 Promulgated Thereunder
(Against Integrys, Wisconsin Energy, Gale E. Klappa and Charles Schrock)**

109.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

110.    Integrys, Wisconsin Energy, Defendant Klappa and Defendant Schrock disseminated the false and materially misleading Registration Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

111.    The Registration Statement was prepared, reviewed, and/or disseminated by Integrys, Wisconsin Energy, Defendant Klappa and Defendant Schrock.  It misrepresented and/or omitted material facts, including material information about the unfair and conflicted sales process, the inadequate consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Company.

112.    Integrys, Wisconsin Energy, Defendant Klappa and Defendant Schrock were at least negligent in filing the Registration Statement with these false and materially misleading statements included therein.

113.    The omissions and false and misleading statements in the Registration Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Acquisition.   In addition, a reasonable investor would view full and accurate disclosures as significantly altering the "total mix" of information made available in the Registration Statement and in other information reasonably available to shareholders.

114.    By reason of the foregoing, Integrys, Wisconsin Energy, Defendant Klappa and Defendant Schrock have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

115.    Because of the false and misleading statements in the Registration Statement, Plaintiff is threatened with irreparable harm, rendering money damages inadequate.   Therefore, injunctive relief is appropriate to ensure the Exchange Act violations are corrected.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

116.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

117.    The Individual Defendants acted as controlling persons of the Company within the meaning of section 20(a) of the Exchange Act as alleged herein.   By virtue of their positions as officers and/or directors of Integrys, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false and misleading statements contained in the Registration Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements in the Registration Statement which Plaintiff contends are false and misleading.

118.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and the other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

119.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Integrys and Wisconsin Electric and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Acquisition.  They were, thus, directly involved in the making of the Registration Statement.

120.     In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Acquisition.  The Registration Statement purports to describe the various issues and information that they reviewed and considered, descriptions of which had input from the Individual Defendants.

121.     As set forth above, the Individual Defendants had the ability to exercise control over, and did control, a person or persons who have each violated section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein.

122.     By virtue of these facts, the Board members have violated, and are liable to Plaintiff and the other members of the Class pursuant to, section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief, in its favor and in favor of the Class and against Defendants as follows:

A.      Declaring that this action is properly maintainable as a class action;

B.      Declaring that the defendants, jointly and severally, violated Sections 14(a) and/or Section 20(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder;

C.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

D.      Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all counts so triable pursuant to Federal Rule of Civil Procedure 38.

Dated: September 3, 2014

/s/ Patrick H. Moran
Patrick H. Moran
WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLC
55 West Monroe Street, Suite 1111
Chicago, IL 60603
Telephone: (312) 984-0000
Facsimile: (312) 984-0001

Gregory M. Nespole
Benjamin Y. Kaufman
Beth A. Landes
WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

*Attorneys for Plaintiff*

## PLAINTIFF'S CERTIFICATION

I, Dennis Raymond, hereby declare under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1. I am the Labor Co-Chairman of the Tri-State Joint Fund ("Tri-State"). I have the authority to make material decisions for Tri-State and make this affidavit in support of the Complaint Tri-State filed as plaintiff in the above-captioned case.

2. I have reviewed the complaint and authorized the commencement of an action on Plaintiffs' behalf.

3. Tri-State did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

4. Tri-State is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

5. At all times relevant to this action, Tri-State held approximately 474 shares of Integrys Energy Group, Inc. securities and continued to hold these shares through the Period set forth in the Complaint.

6. During the three years prior to the date of this Certificate, Tri-State has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

7. Tri-State will not accept any payment for serving as a representative party on behalf of the class beyond the pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2nd day of September 2014.

_Dennis Raymond_
Mr. Dennis Raymond
Tri-State Joint Fund
Labor Co-Chairman